JjJOAN BERNARD ARMSTRONG, Chief Judge.
This is a contract case arising from a lease with options to extend term and to purchase entered into by the Fair Grounds Corporation (FGC) for property located at 111-113 Bourbon Street in New Orleans.
On March 8, 1989, FGC as Lessee and Richard and Patricia Keyworth as Lessor entered into a lease for the ground floor, second floor and limited use of the roof of the subject property, which had been a Mexican restaurant, but which had been vacant for over five years. The two-year lease gave the Lessee a conditional option to extend the term for an additional eight years and .an option to purchase the entire building during the first year of the lease term for $1,250,000. The monthly rental was $10,000. The lease gave the Lessor the option, upon termination or expiration of the lease, to require that the building be replaced in its original condition. FGC could not assign the lease in whole or in part without the prior written consent of the Keyworths, and the Keyworths had the right to refuse to grant consent to any assignment with or without cause and without stating its ^reasons for refusal. The lease gave the Keyworths the right to withhold consent arbitrarily.
By resolutions of September 29, 1988 and May 25, 1989, FGC’s board authorized Mr. Gravolet generally to purchase and dispose of real or movable property on behalf of FGC. A similar resolution in favor of Mr. Louis Roussel, III, a shareholder of and attorney for FGC, was passed on February 23,1989.
On March 13, 1989, Mr. and Mrs. Key-worth executed a note secured by a mortgage on the subject property together with an assignment of leases and rentals in favor of Mr. Roussel. Mr. Gravolet signed the documents as Mr. Roussel’s representative. The record contains a letter pur *128 portedly sent by Mr. Gravolet to FGC on the letterhead of “Mammoth Capital, Inc.”, expressing his understanding that FGC “is agreeable to assign its interest to this “Option to Purchase” to Mammaoth [sic] Capital, Inc. for the consideration of: 1. $100 cash consideration. 2. Purchase of property will be subject to existing lease. 3. Mammoth Capital, Inc. waive the “Security Deposit” requirement of said lease.” According to the letter, Mr. Gravolet undertook that Mammoth would cancel FGC’s bank letter of credit securing its security deposit upon transfer of title to the subject property. The FGC corporate secretary’s affidavit, submitted by FGC in opposition to Mr. Gravolet’s motion for summary judgment, shows that FGC did not authorize or approve the assignment of the option to purchase.
On March 7, 1990, Mr. Roussel wrote to Mr. Keyworth advising that FGC intended to exercise its option to purchase the subject property. The sworn | ¡¡evidence of FGC’s corporate secretary’s affidavit establishes that neither FGC’s directors nor shareholders were advised that the option was exercised. On March 14, 1990, Mammoth executed an Act of Collateral Mortgage, acknowledging a principal debt of $600,000, and an $800,000 promissory note in favor of Mr. Roussel. Mr. Gravolet signed the documents as Mammoth’s president. The record contains a copy of a letter purportedly sent by Mr. Gravolet to FGC on March 15, 1990 advising that Mammoth exercised the option to purchase and future rentals should be sent to “Louie [sic] J. Roussel, III, for credit to account of Mammoth Capital, Inc.” Mammoth and Mr. and Mrs. Gravolet subsequently entered into a real estate exchange with Malcolm Faber whereby the Gravolets acquired the subject property on December 2,1992.
On April 3, 1990, Mr. and Mrs. Bryan Krantz purchased control of FGC through a stock purchase agreement, buying Mr. Roussel’s 49.31% interest, Mr. Gravolet’s 2.34% interest, Mr. Roussel’s father’s 1.37% interest and the .64% interest held by Empire Land Corporation, alleged by FGC to be a Roussel corporation.
On July 7, 1999, FGC and Mr. Gravolet executed a five-year extension of the lease in consideration of monthly rental payments of $13,125. As additional consideration, FGC received the right to exercise before December 1, 1999 an exclusive option to lease the third and fourth floors of the property for an additional monthly rental of $2,000. FGC’s exercise of the option would extend the lease term through March 14, 2009. In that event, base rental from March 14, [42004 through March 14, 2009 would be adjusted in accordance with the Consumer Price Index’s change from March 1999 through March 2004. Furthermore, exercise of the option would eliminate Mr. Gravolet’s right to terminate the lease at any time during the extended term by giving FGC twenty-four month written notice. FGC retained its right to early termination without regard to its exercise of the option to lease the additional floors.
On July 27, 1999, FGC put Mr. Gravolet on notice of its intention to terminate the lease effective April 30, 2000. On January 13, 2000, Mr. Gravolet wrote to FGC through its new co-owner and President, Bryan Krantz, that he was exercising his option to require the building to be replaced in its original condition as per the 1981 building plans prepared by architect A.G. Lyons upon the termination of the lease. Mr. Gravolet claimed in the letter that prior to the commencement of the FGC lease the property “was a newly ren *129 ovated Cisco’s restaurant.”[1]
Following mediation, on April 28, 2000, Mr. Gravolet and FGC entered into an agreement extending the lease termination date to July 31, 2000, and reserving the parties’ rights, as they existed on April 30, 2000.
On July 11, 2000, Mr. Gravolet wrote to FGC claiming he was severely handicapped in his efforts to lease the property because of uncertainty as to when FGC anticipated completing the construction necessary to return the property to its original condition and demanding that rent continue until the property would be so [ sreturned. FGC through Mr. Krantz responded on July 28, 2000, denying that FGC had an obligation to restore the premises to original condition. Mr. Krantz also advised Mr. Gravolet that FGC had no interest in a purchase or exchange of the building at Mr. Gravolet’s approximate valuation of $3,000,000.
On November 7, 2000, Mr. Gravolet filed suit seeking to enforce his understanding of the lease, attaching copies of the original lease; extension agreement of July 7, 1999; Gravolet letters of January 13, 2000 and July 11, 2000; agreement of April 28, 2000; and FGC letter of July 28, 2000. A week later, on November 14, 2000, Mr. and Mrs. Gravolet entered into a sixty-two month lease with Bourbon Street Holdings, LLC, leasing the subject property in consideration of a $28,000 lease execution payment to the Gravolets and monthly rent of $14,000 for the first four months and $28,000 thereafter, with CPI adjustments on renewal terms and additional rent as agreed by the parties.
FGC answered the petition, admitting it made renovations to the building and averring that all improvements were made with the Lessor’s express consent, and admitting the documents attached to the petition insofar as they are the best evidence of their terms. FGC further answered claiming that the restoration clause in the lease was intended as a basis on which the Lessor could condition his consent to FGC’s improvements. FGC contended that the Lessor accepted the substantial improvements FGC made to the leased premises. FGC claimed in the alternative that the July 7, 1999 agreement between it and Mr. Gravolet provided that all rights and obligations under the lease would terminate upon expiration of |fithe lease extension, and that this provision is paramount to and essentially supercedes conflicting lease provisions. FGC alleges that the 1981 Lyons plans do not comply with present-day life safety codes and the Americans with Disabilities Act, thereby making it legally impossible to return the premises to their 1981 condition. In the further alternative, FGC claimed that it returned all the salvageable fixtures and appointments pertaining to a Mexican restaurant to the Lessor, who sold them and retained the funds, making it physically impossible for FGC to return the premises to their 1989 condition.
FGC claimed that Mr. Gravolet breached the lease in at least the following particulars, thereby excusing further performance by FGC: (1) failure to repair and maintain the building including those portions outside the. leased premises; (2) allowing water to leak into the leased premises from the third and fourth floors of the building; (3) failure to maintain the roof; (4) failure to treat for termite infestation that began in the building outside the leased premises; (5) failure to keep the building watertight; (6) reconstruction of the mezzanine area to conform to 1989 *130 condition would decrease the lease value of this French Quarter property, where premium rents are paid for the ambience of high ceilings. FGC claimed the damages Mr. Gravolet sought are speculative or consequential and, as such, are not recoverable in Louisiana.
Following discovery, FGC supplemented its answer, alleging that general equitable principles bar Mr. Gravolet from attempting to enforce contractual rights he obtained through a alleged breach of his fiduciary duty to FGC and through |7assisting Louis Roussel II in allegedly breaching his fiduciary duty to FGC. FGC alleged that prior to acquiring title to the Subject property, Mr. Gravolet was owner of 2.34% of FGC’s outstanding common stock. This holding was part of a controlling block of stock allegedly owned by Mr. Gravolet and Mr. Roussel comprising 53.66% of FGC’s outstanding common shares, entitling Messrs. Gravolet and Roussel to control and direct FGC’s corporate affairs. At all material times prior to April 12, 1990, Mr. Roussel allegedly served as legal counsel to FGC. On February 23, 1989, Mr. Roussel allegedly was appointed agent for FGC and given broad powers to deal on behalf of FGC in real estate matters, including the power to buy, sell or lease any property on terms of his choice. FGC noted Mr. Roussel’s fiduciary duty of loyalty arising out of that empowerment, including the duty to act exclusively in FGC’s best, interest and to avoid taking even the slightest advantage of FGC. FGC gave similar broad real estate-related powers to Mr. Gravolet on October 3, 1988 and May 25, 1989, with similar concomitant obligations. FGC alleges that Mr. Roussel caused FGC to enter into the Keyworth lease, including the option to purchase. After so doing, Mr. Roussel and Mr. Gravolet, using the powers granted to them by FGC, allegedly entered into various contracts as a result of which FGC spent more than $700,000 to improve the leased premises, significantly enhancing the building’s value. Less than six months later, Messrs. Roussel and Gra-volet, using these same powers, allegedly caused FGC to exercise the purchase option on March 5, 1990 and, less than ten days later, using the same powers, allegedly caused FGC to assign its interest in the option to [spurchase to Mr. Gravolet for little or no consideration. FGC claimed that Messrs. Roussel and Gravolet failed to safeguard FGC’s interest by allowing FGC to expend significant resources on improvements to the property without requiring the lease to be modified to eliminate the restoration clause; by allegedly failing to reimburse FGC for the cost of its improvements; and by allegedly assigning FGC’s option.to purchase the property to Mr. Gravolet for a grossly inadequate consideration of $100 and cancellation of the security deposit for which FGC has posted a letter of credit. FGC claims that Messrs. Roussel and Gravolet concealed the assignment by causing the option to be assigned nominally to Mammoth Capital, Inc. (Mammoth), a corporation allegedly owned by Mr. Gravolet and/or members of his immediate family[2]. FGC further alleges that neither the decision to invest $700,000 in improvements to the subject property nor the assignment of FGC’s purchase option to Mr. Gravolet through Mammoth was presented for approval to the FGC Board of Directors.
FGC also contends that about three weeks later, on April 3,1990, Mr. Gravolet, Mr. Roussel, Mr. Roussel’s father and Empire Land Company, allegedly a Roussel corporation, allegedly entered into an *131 agreement to sell their block of controlling FGC shares to Marie and Bryan Krantz for $14,712,810 and other consideration, and this transaction was-perfected on April 12, 1990. On December 2, 1992, Mr. Gra-volet allegedly caused Mammoth to transfer title to the subject property to Mr. Gravolet and his wife, via a property exchange with an unrelated Rthird party. These actions allegedly bar Mr. Gravolet from attempting to enforce the restoration clause in the original lease against FGC. The trial court allowed FGC to file this supplemental and amended answer, but did not address the allegations in its reasons for granting Mr. Gravolet’s motion for partial summary judgment.[3]
On July 25, 2001, Mr. Gravolet moved for partial summary judgment that FGC breached its lease agreement for failure to restore the premises to their 1989 condition, filing a copy of the original lease; responses to requests for admissions and interrogatories; copy of a newspaper article concerning the transformation of the former Kreeger’s department store space into a Cisco’s Restaurant; and copy of Cisco’s offer to sell its leasehold improvements in return for assumption of its lease.
FGC opposed the motion. In support of its opposition, FGC offered the following exhibits[4]:
(1) Keyworth lease
(2) Attorney P.J. Stakelum affidavit addresses the impropriety of granting summary judgment on the liability at this stage of the proceedings. Mr. Stakelum avers that FGC desires to take the depositions of Mr. Gravolet, Mr. Roussel and Mr. Keyworth in connection with FGC’s arguments that (a) the lease termination under the July 7, 1999 lease extension agreement bars enforcement of the restoration clause, and (b) Mr. Gravolet acquired his interest in the lease through |inexercise of a right obtained by his breach of his fiduciary obligations to FGC acting independently and in concert with Mr. Roussel who similarly breached his fiduciary obligations to FGC. The requested deposition testimony would support Mr. Kurtz’s affidavit. FGC also seeks to take the deposition of Mr. Gravolet and state and municipal regulators to prove FGC’s affirmative defenses relating to Mr. Gravolet’s failure to maintain the building and the effect of current building codes on FGC’s ability to reconstruct the building in accordance with the 1981 Lyons plans.
(3) Lease extension agreement dated July 7, 1999 providing that if FGC exercises its right to terminate during the extended term by nine month written notice, all rights and obligations of both parties under the Lease shall cease upon the expiration of the nine-month period.
(4) William H. Kurtz affidavit
Mr. Kurtz served as FGC’s executive vice-president from August 1990 through December 31, 1993, and since then as FGC’s real estate consultant with respect to the subject property. In early 1999, he and Mr. Gravolet engaged in negotiations resulting in the execution of the lease' extension agreement of July 7, 1999. Mr. Gravolet sought a significant increase in the $10,000 fixed minimum monthly rent, and under a compromise agreement the parties agreed to extend the lease for five years and increase the fixed minimum *132 monthly rent to $13,125. The compromise was made possible by the provision that each party had a right of early termination by which it could unilaterally terminate the lease and walk away from the arrangement by giving the other party an agreed upon advance notice. Mr. Gravolet’s right of early termination was intended to allow him to terminate [nthe lease if he found a better tenant and to allow FGC twenty-four months to locate an alternative site and to build out a new off-track betting parlor. FGC’s right of early termination was intended to allow FGC to terminate the lease and walk away from the arrangement whenever it felt that the Bourbon Street location was no longer economically suitable for its purposes. The nine-month notice allowed Mr. Gravolet sufficient time to locate a new tenant and guaranteed him at least $118,125 while he looked for a new tenant. In fact, FGC gave twelve months’ notice, guaranteeing Mr. Gravolet $157,500 while obtaining a new tenant.[5] The intent of the lease extension agreement was to limit FGC’s lease obligations in the event of early termination to payment of fixed minimum rent and its proportionate share of taxes and insurance through the date of termination and to surrender the property in broom-clean condition. It was never the common intent of the parties that Mr. Gravolet would be entitled to compel FGC to restore the property to its pre-lease 1989 condition.
(5)Bryan G. Krantz affidavit
Mr. Krantz, President and General Manager of FGC, with his wife purchased controlling interest in FGC by a stock purchase agreement of April 3, 1990. They bought 49.31% from Mr. Roussel, 2.34% from Mr. Gravolet, 1.37% from Mr. Rous-sel’s father and .64% from Empire Land Corp. In July 1999, FGC exercised its right of early termination under the lease extension agreement, giving Mr. Gravolet nine months notice. By mutual consent, Mr. Gravolet and FGC agreed to delay termination until July 31, 2000. From the date FGC gave | ^termination notice through the termination date, FGC paid Mr. Gravolet $157,500 in fixed minimum rent.
(6) FGC resolutions of September 29, 1989 appointing Mr. Gravolet real estate agent
(7) FGC resolutions of February 23, 1989 appointing Mr. Roussel real estate agent
(8) FGC resolutions of May 25, 1989 appointing Mr. Gravolet real estate agent
(9) FGC minutes of January 24, 1989 appointing Mr. Roussel attorney for FGC
(10) FGC minutes of January 23, 1990 appointing Mr. Roussel attorney for FGC
(11) Mr. Roussel’s letter to Mr. Key-worth of March 7, 1990 advising that FGC intended to exercise its option to purchase
(12) Mr. and Mrs. Keyworth’s $1,000,000 note payable to Mr. Roussel dated March 13, 1989, paraphed for identification with mortgage and assignment of leases and rentals dated March 13, 1989
(13) Act of Mortgage by Mr. and Mrs. Keyworth to Mr. Roussel dated March 13, 1989, signed by Mr. Gravolet as Mr. Rous-sel’s representative
(14) Extract from FGC’s 1989 Annual Report to Shareholders, showing the cost of FGC’s improvements and furnishings in the Subject property to be approximately $690,000
*133 (15) Mr. and Mrs. Keyworth’s assignment of leases and rentals to Mr. Roussel dated March 13, 1989, signed by Mr. Gra-volet as Mr. Roussel’s representative
_|^(16) Mr. Gravolet’s letter of March 14, 1990 on Mammoth letterhead
(17) David R. Sherman affidavit
Mr. Sherman, FGC’s Secretary, attested to the accuracy of the copies of FGC board resolutions and minutes, Exhibits 6, 7, 8, 9, 10, and the extract from the 1989 annual report to shareholders, Exhibit 14. He averred further that the FGC board of directors never adopted any resolutions approving the exercise of the option to purchase or otherwise authorizing FGC to purchase the Subject property. Furthermore, he averred that the board of directors never adopted any resolutions authorizing or approving the assignment of the option to purchase to Mr. Gravolet or to any other person. According to Mr. Sherman’s sworn affidavit, there is no corporate record indicating that the FGC board of directors or shareholders were informed that the option to purchase was exercised or assigned.
(18) Mr. Gravolet’s letter of March 15, 1990 to FGC on Mammoth stationery
(19) March 14,1990 Collateral Mortgage by Mammoth in favor of Mr. Roussel
(20) Mammoth’s $800,000 promissory note dated January 15,1991
(21) Collateral Mortgage and Security Agreement by Mammoth in favor of Mr. Roussel, dated January 15,1991
(22) Amendment to $800,000 note dated January 4,1992
(23) Mr. Gravolet’s letter to Lawyers Title dated November 5,1992
Mr. Gravolet asked Lawyers Title to prepare a cash act of sale whereby Malcolm Faber would purchase the subject property from Mammoth for $725,000. Mr. Gravolet advised that his wife would appear for Mammoth and that “Louie”, presumably Mr. Roussel, was holding the note that would be paid in full at the Jbsale- Mr- Gravolet also asked Lawyers Title to prepare an act of exchange whereby he would exchange 9119-9127 Airline Highway to Mr. Faber in exchange for the subject property. $120,000 would be attributed to the Airline Highway property and $725,000 to the subject property. The Whitney Bank would present the proceeds held in trust for the “deferred exchange” which would total approximately $240,000. Mr. Gravolet would borrow $400,000 from “Louie” secured by a $1,000,000 collateral mortgage note on the subject property.
(24) Act of exchange and assignment of leases between Mr. and Mrs. Gravolet and Mr. and Mrs. Malcolm J. Faber dated December 2,1992
(25) Mr. and Mrs. Gravolet’s $600,000 promissory note payable to Mr. Roussel dated December 2,1992
(26) $1,000,000 collateral mortgage and security agreement by Mr. and Mrs. Gra-volet in favor of Mr. Roussel dated December 2,1992
(27) Mr. Gravolet’s objections and verified responses to FGC’s first set of interrogatories
(28) Lease between Mr. and Mrs. Gra-volet and Bourbon Street Holdings, LLC dated November 14, 2000
The trial court granted Mr. Gravolet’s motion for partial summary judgment, holding that it interpreted the lease and lease extension to give Mr. Gravolet the right to require FGC to restore the premises to their original condition. Furthermore, the trial court held that the lease extension did not modify, supplement or amend the restoration clause. The trial court denied FGC’s motion for new trial.
*134 The issues of damages and mitigation of damages were tried to the court on September 24 through October 2, 2002. Following trial, the court awarded Mr. | ^Gravolet $880,470 for restoration expenses, $168,000 for six months of lost rent and $349,490 for attorney’s fees. The court reiterated its previous finding that FGC was bound by the restoration clause in the original lease. The court noted that although returning the building to its original condition would not conform to current building code requirements, alternative measures were available that would conform to code requirements while maintaining the essence of the original architectural design. The court found consistent testimony that the restoration would take six months, and awarded Mr. Gravolet six months’ rent at the rate FGC paid at the termination of its lease.
Mr. Gravolet moved for a new trial, seeking recovery of taxes and pre- and post-judgment interest. Mr. Gravolet proposed an amended judgment awarding $1,600,855 for restoration expenses; $168,000 for lost rent; $598,618.33 for attorney’s fees; and $286,653.28 for interest, and moved to tax costs and interest on costs. FGC moved for a suspensive appeal of the trial court’s judgments (1) granting Mr. Gravolet’s motion for partial summary judgment; (2) denying FGC’s motion for new trial with respect to the summary judgment motion; and (3) awarding damages. Mr. Gravolet answered the appeal and filed a separate appeal that has been consolidated with the instant appeal, seeking recovery of income taxes and interest, the full amount of lost rent, taxes and insurance he allegedly must pay as a result of FGC’s breach of the lease agreement, and additional attorney’s fees.
|1fiFor the reasons that follow, we reverse the trial court’s judgment granting partial summary judgment, and remand for further proceedings consistent with this opinion.[6]
Appellate courts review summary judgments de novo, using the same criteria applied by trial courts to determine whether summary judgment is appropriate. Independent Fire Insurance Company v. Sunbeam Corp., 99-2181, 99-2257 (La.2/29/2000), 755 So.2d 226. The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of actions such as this. The procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966(A)(2). A summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, scrutinized equally, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). The burden of proof remains with the mover. Board of Assessors of the City of New Orleans v. City of New Orleans, 2002-0691, p. 8 (La.App. 4 Cir. 9/25/02), 829 So.2d 501, 506, writ denied 2002-2633 (La.1/10/03), 834 So.2d 439. However, if the mover will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mover’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support 117sufficient *135 to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. La. C.C.P. art. 966(C)(2).
A fact is material if it is essential to a plaintiffs cause of action under the apphcable theory of recovery and if, without the estabhshment of the fact by a preponderance of the evidence, plaintiff could not prevail. Generally, material facts are those that potentially insure or preclude recovery, affect the litigant’s ultimate success, or determine the outcome of a legal dispute. Prado v. Sloman Neptun Schiffahrts, A.G., 611 So.2d 691, 699 (La.App. 4th Cir.1992), writ not considered 613 So.2d 986 (La.1993).
Thus, we apply a two-prong test to determine whether Mr. Gravolet’s motion for partial summary judgment as to liability should have been granted: (1) has he established that no genuine issues of material fact remain? (2) If so, does the record show that he is entitled to judgment as a matter of law?
Before a trier of fact can reach the issue of the interpretation of the lease and lease extension agreements, Mr. Gravolet must prove by a preponderance of the evidence that he is the Owner/Lessor of the subject property and by reason of this status is entitled to enforce the provisions of the lease against FGC. Our review of the record in its entirety de novo convinces us that the uncontroverted evidence of record does not support Mr. Gravolet’s alleged right to ownership of the property. The original lease agreement clearly provides that the option to purchase the property within the first year of the lease term was a corporate right appertaining to FGC. Mr. Roussel’s March 7, 1990 letter to Mr. Keyworth indicates that the corporation intended to exercise its option to purchase. None of the documents executed in connection with the exercise of FGC’s option and the assignment of the lease to Mammoth or to Mr. Gravolet recites the existence of a resolution by 11sthe corporation’s board of directors authorizing the corporation’s exercise of the option to purchase or the transfer of that option to Mammoth and/or Mr. Gravolet. Mr. Gravolet has not produced such a resolution. To the contrary, FGC’s corporate secretary, Mr. Sherman, swears in his affidavit that the board of directors of the corporation never adopted resolutions approving the exercise of the option to purchase, otherwise authorizing FGC to purchase the property or authorizing or approving the assignment of the option to purchase to Mr. Gravolet or to any other person. Furthermore, the evidence of Mr. Sherman’s affidavit is un-controverted that neither the FGC board nor its shareholders were informed that the option to purchase was exercised or was assigned to Mr. Gravolet.
Furthermore, there is no evidence that Mr. and Mrs. Keyworth approved the purported assignment of the option to purchase by FGC to Mammoth. The Keyworth lease provided, as noted herein-above, that FGC could not assign the lease “in whole or in part” without the prior written consent of the Keyworths, and that the Keyworths had an absolute right to refuse to consent arbitrarily.
In addition, the issue of Mr. Gravolet’s alleged breach of the lease by reason of his failure to maintain the non-leased portions of the subject property remains open. Mr. Gravolet had the burden of proving on his motion for partial summary judgment that he had not failed to maintain the property in a watertight and termite-free condition. Only upon his having provided such evidence would the burden of proof have shifted to FGC under LSA-C.C.P. art. 966(C)(2).
*136 The record also contains certified copies of resolutions by the FGC board of directors making Messrs. Gravolet and Roussel agents and, in Mr. Roussel’s case, an attorney for the corporation, with the fiduciary duties attendant on those positions. Mr. Krantz’s affidavit is uncontro-verted and establishes that MrJ^Gravolet together with Mr. Roussel were controlling shareholders of FGC prior to the Krantz purchase, owning a majority of the corporation’s outstanding common shares. Material issues remain to be addressed concerning the alleged breach of fiduciary duties, vel non, by these individuals and the validity of the allegedly self-dealing transactions through which Mr. and Mrs. Gravolet ultimately gained title to the subject property. Thus, there is a significant, genuine issue of material fact as to Mr. Gravolet’s right to enforce the restoration clause or, indeed any provision of the lease and the lease extension agreements.
We find, on our review of the entire record, that the pleadings, depositions, answers to interrogatories, admissions and affidavits, read equally, do not entitle Mr. Gravolet to judgment as a matter of law.
Because of our resolution of the partial summary judgment issue, Mr. Gravolet’s appeal, his cross-appeal by way of answer to FGC’s appeal and FGC’s remaining assignments of error, all of which deal with the issue of damages, are moot and are pretermitted until such time as the liability issue has been determined.
For the foregoing reasons, we reverse the judgment of the trial court granting Mr. Gravolet’s motion for partial summary judgment and remand the case to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.

. FGC offered evidence that, in fact, the Cisco's restaurant had been vacant for over five years at the time FGC entered into the Key-worth lease.

. As noted herein, Mr. Gravolet signed authentic acts in his capacity as Mammoth’s president, and purportedly wrote to FGC on Mammoth letterhead.

. The only mention of these allegation is the following language in the trial court’s judgment on FGC’s motion for new trial: "This Court finds that the affirmative defenses asserted in the Supplemental and Amended Answer do not change the Court's holding in the previous judgment granting the plaintiffs Motion for Partial Summary Judgment.”

. With the exception of the affidavits, FGC submitted copies of documents listed.

. Mr. Gravolet in fact found such a tenant and executed a lease on November 14, 2000, advantaging himself by the $28,000 lease execution payment and by the substantial increase in monthly rentals.

. Because the trial court admitted no evidence on the liability issue at trial, and FGC did not move for partial summary judgment below, we must remand the case.